# UNITED STATES DISTRICT COURT

### for the

### Eastern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| ANDERSON THURSTON | ) | 2:25-mj-0034 JDP |
| | ) | |
| | ) | |

*Defendant(s)*

**FILED**

**Feb 18, 2025**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

SEALED

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 7, 2024, _____ in the county of _____ Solano _____ in the _____ Eastern _____ District of _____ California _____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| **18 U.S.C. § 922(g)** | **Felon in Possession of a Firearm** |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet and incorporated here by reference.

_____
/s/ Joseph Centofranchi
*Complainant's signature*

Special Agent Joseph Centofranchi, ATF
*Printed name and title*

Sworn to me and signed via telephone.

Date: ___February 18, 2025___

_____
*Judge's signature*

City and state: ___Sacramento, California___

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

### AFFIDAVIT OF ATF SPECIAL AGENT JOSEPH CENTOFRANCHI IN SUPPORT OF CRIMINAL COMPLAINTS AND SEARCH WARRANTS

1.    I, Joseph Centofranchi, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent, being duly sworn, hereby state:

### SCOPE OF REQUESTED CRIMINAL COMPLAINTS

2.    This Affidavit is submitted in support of Criminal Complaints and arrest warrants for the individuals listed below based upon the identified violations of federal law.

| Defendant | Charge |
|---|---|
| Zuryess Anthony ROBERTS  | On or about November 20, 2024, ROBERTS knowingly and intentionally possessed and transferred a machinegun, in violation of 18 U.S.C. § 922(o). |
| Taezon Laurece SANDERSON  | On or about September 10, 2024, SANDERSON knowingly and intentionally was a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g). |

| Defendant | Violation |
|---|---|
| Divaya James TALLEY  | On or about February 5, 2025, TALLEY knowingly and intentionally possessed and transferred a machinegun, in violation of 18 U.S.C. § 922(o). |
| Anderson Purnell THURSTON  | On or about August 7, 2024, THURSTON knowingly and intentionally was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). |
| Napoleon Curtis WASHINGTON  | On or about July 31, 2024, WASHINGTON knowingly and intentionally was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). |

**SCOPE OF REQUESTED SEARCH WARRANTS**

3.    This Affidavit is also submitted in support of applications for warrants to search the locations and persons further described below and in **Attachments A-1 through A-5**. The contraband, objects, and information for which we will search are described in **Attachment B**.  Attachments A-1 through A-5 and Attachment B are incorporated here by reference.

2

4. There is a fair probability that each location listed below will contain evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- Engaging in the business of importing, manufacturing, or dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A), and conspiring to do so;

- Felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1);

- Possession and transfer of a machinegun, in violation of 18 U.S.C. § 922(o);

- Traveling from any state or foreign country into any other state to acquire, or attempt to acquire, a firearm in such other state in furtherance of such purpose, in violation of 18 U.S.C. § 924(n); and

- Knowingly purchasing, or conspiring to purchase, any firearm in or otherwise affecting interstate or foreign commerce for, on behalf of, or at the request or demand of any other person, in violation of 18 U.S.C. § 932(b).

5. I respectfully request authority to search the following locations for the items described in **Attachment B** and seize the items listed in that Attachment:

   i. **One Black 2013 BMW 528i, bearing California license plate 9EPY801, Vehicle Identification Number: WBAXG5C57DDY35569** (vehicle used by ROBERTS in furtherance of the violations described below), described in **Attachment A-1**;

   ii. **3000 Irwin Street, Vallejo, California 94591** (Residence of Divaya TALLEY), described in **Attachment A-2**;

   iii. **100 Larissa Lane, Apartment 116, Vallejo, California 94590** (Residence of Anderson THURSTON), described in **Attachment A-3**;

   iv. **One 2007 Infiniti M45, bearing California license plate 5VZP875, Vehicle Identification Number: JNKAY01E27M305217** (vehicle used by Divaya TALLEY and Tae SANDERSON in furtherance of the violations described below), described in **Attachment A-4**; and

3

v.  **One 2004 Toyota Prius, bearing California license plate 9NIS825, Vehicle Identification Number: JTDKB20U540076949** (vehicle used by by Divaya TALLEY and Tae SANDERSON in furtherance of the violations described below), described in **Attachment A-5**.

## OVERVIEW of Investigation into Zuryess ROBERTS and his Network of Firearms Traffickers in Vallejo

6. Since July 2024, the ATF's Oakland Field Office has been investigating members of a loosely-affiliated group headed by Zuryess ROBERTS to illegally sell dangerous, high-powered weapons in the city of Vallejo using a Super 8 motel as the hub of their criminal activity. The Super 8 motel is located at 2070 Solano Avenue, Vallejo, California.

7. This investigation is a part of a larger collaborative effort to address violent crime in the city of Vallejo. Started in 2024, the Vallejo Public Safety Partnership ("PSP") is a multi-faceted violence-reduction strategy that relies on innovative data-driven strategies to promote public and community safety. Participating PSP partners include: the Vallejo Police Department, the Solano County District Attorney's Office, Sacramento FBI, Sacramento DEA, Oakland ATF, the Sacramento U.S. Marshals, and the U.S. Attorney's Office.

8. As detailed below, ATF used a confidential informant ("the CI") to infiltrate a criminal network overseen by Zuryess ROBERTS. During the investigation spanning 2024 and continuing through February 2025, the CI conducted multiple controlled gun deals from members of the ROBERTS network. This included controlled buys made directly by the CI from ROBERTS, SANDERSON, TALLEY, THURSTON, and WASHINGTON. During these recorded interactions, the CI captured the faces and voices of each defendant. Agents collected numerous recorded text messages and phone calls confirming that ROBERTS is a leader of this group and controls the sales of firearms conducted by each of the defendants described in this Affidavit. Consistent with this thesis, during a recorded communication during a firearms deal, ROBERTS explained to the CI that no one is supposed to do anything without ROBERTS's permission. Some of the comments made by members of the ROBERTS network also revealed a willingness to commit crimes of violence if the right circumstances arose.

4

9. For convenience of reading through the Affidavit, below is a summary chart of the controlled buys of firearms conducted by the CI into the ROBERTS network during this investigation:

| Date | Firearm(s) purchased | Defendant(s) |
|---|---|---|
| July 31, 2024 | Springfield Armory, model XDs-9, 9mm caliber pistol, serial number: S3951062 | Anderson THURSTON Napoleon WASHINGTON |
| August 7, 2024 | Mossberg, model 500A, 12-gauge Weapon Made from a Shotgun | Anderson THURSTON |
| August 29, 2024 (2 deals) | FIE, Titan Tiger model, .38 special with ammunition<br><br>Polymer 80, PF940V2, 9mm pistol with ammunition | Napoleon WASHINGTON<br><br>Divaya TALLEY |
| September 5, 2024 | Two RG Industry revolvers with ammunition | Zuryess ROBERTS Anderson THURSTON |
| September 10, 2024 (2 deals) | Privately Manufactured Firearm Machinegun with 30 round high-capacity magazine<br><br>Privately Manufactured Firearm Any Other Weapon (NFA carbine) with a high-capacity magazine containing 31 rounds of assorted 9mm ammunition | Divaya TALLEY<br><br>Tae SANDERSON |
| September 17, 2024 | Privately Manufactured Firearm Machinegun | Divaya TALLEY Tae SANDERSON |
| September 30, 2024 | SCCY, CPX-1, 9mm pistol bearing obliterated serial number C423956 and 7 rounds of 9mm ammunition<br><br>Norinco, SKS bearing serial number D24027067 along with 28 rounds of 7.62x39 ammunition | Zuryess ROBERTS |

| Date | Firearm(s) purchased | Defendant(s) |
|------|---------------------|--------------|
| November 13, 2024 | P80 with Glock 21 slide, .45 caliber pistol and 14 rounds of .45 caliber ammunition | Divaya TALLEY Tae SANDERSON |
| November 20, 2024 | RIA, m1911, .45 caliber pistol, Glock 19, 9mm pistol and a drop-in, style Machinegun Conversion Device | Zuryess ROBERTS |
| February 5, 2025 | Machinegun | Divaya TALLEY |

## **AFFIANT'S BACKGROUND AND EXPERTISE**

10. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives, and have been since February 2020. I am presently assigned to the ATF Oakland Field Office in Oakland, California. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia.

11. As an ATF Special Agent, I have been trained to conduct and participate in both state and federal investigation involving the trafficking of firearms and distribution of controlled substances. I have received training in investigating and assisting in the prosecution of criminal street gangs engaged in illegal narcotics and firearms trafficking. I have received training and participated in various types of investigative techniques, including using electronic surveillance, undercover agents, and informants. I have participated in physical surveillance operations and have participated in the execution of federal and state search and arrest warrants. In addition to utilizing the aforementioned investigative techniques, I have been trained to analyze information resulting from traditional and electronic record searches.

12. Prior to being employed as an ATF Special Agent, I was a Law Enforcement Officer for the Ocean City Police Department in Ocean City, Maryland for approximately 13 years. During that time, I conducted various types of investigations, including but not limited to, investigations relating to robbery, theft, assault, narcotics, weapons, and traffic fatalities.

13. In addition to my personal knowledge, this Affidavit is based upon: (1) conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (2) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data; (3) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (4) a review of public records, telephone toll records, and subscriber information; (5) information provided from confidential informants and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as an ATF Special Agent; and/or (9) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

14. Because this Affidavit is submitted for the limited purpose of supporting the requested Criminal Complaint and search warrants, I have not included the details of every aspect of the investigation.  I have set forth only the facts necessary to establish probable cause to charge the defendants listed in this affidavit.  I have not intentionally omitted information that the Court would need to assess probable cause for the arrest of the defendants or search of the requested locations.

## STATEMENT OF PROBABLE CAUSE

### July 31, 2024 – The CI conducted a controlled purchase of a firearm with THURSTON and WASHINGTON at the Super 8 motel

15. Beginning in early July 2024, the Vallejo Police Department identified the Super 8 hotel, located on 2070 Solano Avenue, in Vallejo, as an area of violent crime episodes, as well as a location with open acts of drug trafficking and firearms dealing.  An ATF CI was introduced into the area to determine which individuals were engaged in criminal activities in and around the parking lot of the Super 8 hotel. The CI has previously proven to be reliable through their work on numerous other ATF cases.  The CI receives monetary compensation for assisting ATF.

16. The CI has a felony conviction for second degree robbery in violation of California Penal Code § 211 from 2004.  The CI's information in this investigation has been corroborated through audio and video recordings, as detailed during each controlled purchase below.  I am not aware of the CI providing false or misleading information in this investigation.  For these reasons, I believe the CI is reliable in this investigation.

17. In mid-2024, the CI began spending time in and around the Super 8 hotel parking lot.  Consistent with Vallejo PD's experience with crimes being committed in the area of the Super 8 hotel over the last couple of years, within a short period of time, the CI was approached by an individual who identified himself to the CI as "M." Investigators were able to identify "M" as Anderson THURSTON – a felon with an extensive criminal history.  THURSTON advised the CI that he (THURSTON) could obtain firearms for the CI to purchase if he/she was interested.  The CI represented that he/she was interested in purchasing firearms and, as a result, THURSTON began introducing the CI to various people involved in criminal activity in and around the Super 8 hotel.  In the days leading up to July 31, 2024, the CI coordinated with THURSTON via recorded communications and in-person contacts to buy firearms.  During these interactions, THURSTON would advise the CI in no specific terms what was for sale and that the CI would have to "pull up" to purchase a firearm.

18. On July 31, 2024, ATF purchased a Springfield Armory pistol from THURSTON and WASHINGTON utilizing the CI.  On July 31, at approximately 1:10 p.m., the CI arrived in his/her vehicle in the parking lot of the Super 8 hotel located on 2070 Solano Ave, in Vallejo.  At approximately 1:14 p.m., THURSTON entered the CI's vehicle, explained to the CI that he (THURSTON) was getting three (3) firearms and was paying $600 per firearm.  While waiting for THURSTON's source to arrive, THURSTON left the CI's vehicle and began conversing with other people who were in the parking lot at the Super 8 hotel.

19. Eventually, THURSTON came back to the CI's vehicle and explained that "the dude" who was coming back had a brand new one, in the box that had never been fired.  THURSTON said the firearm is a "9mm real, gun" and that the seller wanted $800 for the gun.  THURSTON advised the CI that the seller wanted $900 for the firearm but THURSTON told him that he (THURSTON) only had $800.  The CI told THURSTON that he/she wanted to see it.  THURSTON advised the CI that the seller was coming over with the firearm for the CI to examine.  THURSTON advised the CI that after he (THURSTON) brought the single firearm to the CI, the CI could "cash" him

8

(THURSTON) out (provide a monetary finder's fee of $100). THURSTON said that after this single firearm purchase, they (THURSTON and the CI) could do deals for the "other three" firearms from a different seller.

20. At approximately 1:26 p.m., THURSTON and a subject later identified as Napoleon Curtis WASHINGTON, returned to the CI's vehicle. WASHINGTON has prior felony convictions for possession of controlled substances, and possession of controlled substances while armed. THURSTON entered the front passenger seat with WASHINGTON outside the open front passenger door. The CI, WASHINGTON, and THURSTON began talking about additional firearms deals.

21. WASHINGTON produced a Springfield Armory, model XD-9, 9mm caliber pistol. While the CI counted out cash for WASHINGTON, THURSTON remarked that some of that money belonged to him. The CI advised WASHINGTON that he (WASHINGTON) should give the CI ammunition with the firearm. WASHINGTON advised the CI that he (WASHINGTON) left one round in the magazine so that the CI could make sure the firearm worked.

22. During the course of this gun buy, the CI and WASHINGTON agreed to conduct future firearm deals. Before ending the interaction that day, THURSTON insisted that WASHINGTON and the CI exchange phone numbers. THURSTON advised the CI that he (THURSTON) was trying to introduce the CI to the "people who got the shit" (in this context, the CI and I believe "the shit" refers to firearms). THURSTON advised the CI that "if I fuck with you, they fuck which you." THURSTON informed the CI that his people "stay ready." The CI paid $800 to WASHINGTON for the firearm and $100 to THURSTON for the finder's fee. Below is a photograph of the firearm and ammunition purchased from THURSTON and WASHINGTON.



23. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with THURSTON and WASHINGTON.  It should be noted that the actual language used in the conversation between the CI, THURSTON, and WASHINGTON is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

24. An ATF interstate nexus expert confirmed that the Springfield Armory, model XD-9, 9mm caliber pistol purchased on July 31, 2024, was made outside of the state of California.  Because this item was purchased in California, it necessarily traveled in/affected interstate or foreign commerce.

10

**August 7, 2024 – The CI purchased a Mossberg, model 500A, 12-gauge Weapon Made from a Shotgun from THURSTON**

25. On August 7, 2024, ATF conducted a controlled purchase of a Mossberg, model 500A, 12-gauge weapon made from a shotgun from THURSTON using the CI.  At the direction of Agents, the CI placed multiple recorded telephone calls and sent multiple messages to THURSTON utilizing THURSTON's cell phone number at the time.  THURSTON agreed to meet at the Super 8 hotel again on 2070 Solano Avenue in Vallejo.  THURSTON advised the CI that he (THURSTON) had multiple firearms for sale.

26. At approximately 6:42 p.m. on August 7, surveillance observed a black, 2023, Kia Forte bearing California license plate 9JIY742, enter the parking lot of the Super 8 hotel.  At approximately 6:54 p.m., THURSTON exited the Kia and approached the CI.  THURSTON advised the CI that his (THURSTON's) source was no longer in the area.  THURSTON advised the CI that he (THURSTON) had a shotgun in his trunk that he would sell the CI.

27. THURSTON advised the CI to tell their potential buyer (the CI was operating under the ruse that he/she was purchasing firearms to resell) of the "shotgun" that he (THURSTON) would sell the "shotgun" to the CI for $850.  THURSTON explained to the CI that the "shotgun" would hold 8 shotgun shells and explained where the magazine was located on the weapon.  THURSTON advised the CI that for $850, THURSTON would give the CI the three shotgun shells he (THURSTON) had.

28. The CI agreed to purchase the weapon made from a shotgun from THURSTON for $850 and exchanged the money with him (THURSTON).  the CI brought the weapon made from a shotgun over to his/her trunk and secured it inside before he/she walked back over to where THURSTON was standing near the black Kia Forte.  While standing with THURSTON, Zuryess ROBERTS approached THURSTON and the CI.

29. ROBERTS has numerous arrests, but no felony convictions. He began speaking to the CI.  The CI, THURSTON, and ROBERTS walked over to a white-colored Audi, also parked in the Super 8 parking lot.  This Audi was a 2011, Audi Q5 bearing California license plate 6PGW459.  ROBERTS engaged the CI in a conversation about the CI purchasing fentanyl pills from ROBERTS to make money.  ROBERTS offered to sell the fentanyl pills to the CI for $1.50 to $2.00 per pill.  ROBERTS informed the CI that they could then turn around and sell those same pills for approximately $15.00 each.

11

30. ROBERTS, THURSTON, and the CI discussed selling firearms to Norteño and Sureño gang members.  The CI used a ruse with THURSTON and ROBERTS and explained to them that the firearms the CI purchased would be re-sold to both "Northerners" and "Southerners."  THURSTON advised the CI that if they (the people the CI was talking about selling the firearms to) were not police and the money was green, it was good.  Below is a photograph of the weapon made from a shotgun that the CI purchased from THURSTON on August 7.



31. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with THURSTON.  It should be noted that the actual language used in the conversation between the CI, and THURSTON is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

32. An ATF interstate nexus expert confirmed that the Mossberg, model 500A, 12-gauge weapon made from a shotgun purchased on August 7, 2024, was made outside of the state of California.  Because this item was purchased in California, it necessarily traveled in/affected interstate or foreign commerce.

**August 29, 2024 – the CI purchased an FIE, Titan Tiger model, .38 special with ammunition from Napoleon WASHINGTON and a Polymer 80, PF940V2, 9mm pistol with ammunition from Divaya TALLEY**

33. On August 29, 2024, ATF conducted a controlled purchase of an FIE, Titan Tiger model, .38 special revolver along with six rounds of ammunition from Napoleon WASHINTON using the CI.  the CI also purchased a Polymer 80, PF940V2, 9mm pistol with a high-capacity magazine containing 21 rounds of 9mm ammunition from Divaya TALLEY. At the direction of agents, the CI placed multiple recorded phone calls to WASHINGTON at telephone (415) 216-7351 and messages to TALLEY at telephone (707) 674-1638.

34. During those calls and messages, the CI negotiated the purchase of the two firearms from WASHINGTON and TALLEY respectively.  The CI agreed with WASHINGTON and TALLEY to conduct the firearms deals in the parking lot of the Super 8 hotel, located at 2070 Solano Avenue in Vallejo at different times.  Prior to these controlled deals, TALLEY had been introduced to the CI by ROBERTS as one of his (ROBERTS) associates.  Agents were able to identify TALLEY as Divaya James TALLEY.  TALLEY has no criminal history as an adult.

35. The CI arrived in the Super 8 parking lot in his/her vehicle and contacted WASHINGTON via phone.  WASHINGTON advised the CI that he was pulling up to the CI's location.  Agents observed WASHINGTON operating a standing-style electric scooter travel into the Super 8 parking lot at approximately 4:46 p.m.  WASHINGTON entered the CI's vehicle in the front passenger seat and removed a black nylon case from the backpack that WASHINGTON was wearing.  WASHINGTON unzipped the small nylon case and the CI counted out the agreed-upon sum of $650.  WASHINGTON removed an FIE Titan Tiger model, .38 special caliber revolver.  The nylon case contained six .38 special caliber rounds.  WASHINGTON advised the CI that he (WASHINGTON) would contact the CI the next time he had a firearm for sale.  The CI exchanged the money for the firearm and ammunition and WASHINGTON left the area.

13



36. The CI remained in his/her vehicle and contacted ROBERTS to find out where TALLEY was located. ROBERTS advised the CI that TALLEY was waiting for him (ROBERTS) to give TALLEY a ride to the Super 8 where the CI was positioned. At 5:12 p.m., ROBERTS arrived at the Super 8 with TALLEY inside his vehicle. TALLEY exited ROBERTS's vehicle and got into the CI's vehicle in the front passenger seat. TALLEY removed a pistol from his waistband that had an extended magazine. The pistol TALLEY removed from his waistband was a Polymer 80, PF940V2, 9mm pistol bearing no serial number. This Polymer 80 was a Privately Made Firearm ("PMF"), popularly known as "ghost guns." The PMF delivered by TALLEY contained no serial number. This Polymer 80 pistol was loaded with 20 rounds of 9mm ammunition. The CI counted out the agreed-upon sum of $650 and exchanged that money for the firearm and ammunition. After this exchange, TALLEY exited the vehicle. The firearm the CI purchased is depicted below.



37. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with WASHINGTON and TALLEY.  It should be noted that the actual language used in the conversation between the CI, WASHINGTON and TALLEY is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

**September 5, 2024 – the CI purchased two RG Industry revolvers with ammunition from THURSTON and ROBERTS**

38. On September 4, 2024, the CI received the following photograph from TALLEY depicting a firearm that TALLEY was offering to sell to the CI for $1,350.  TALLEY used the phone number of (707) 474-1462 to send this photograph and to speak with the CI.  Agents later discovered this phone number belonged to TALLEY's mother.



39. On September 4, 2024, the ATF conducted a controlled purchase of two RG Industry revolvers from THURSTON and ROBERTS using CS-1.  At the direction of agents, the CI placed multiple recorded communications with TALLEY to purchase the above firearm.  The CI and TALLEY agreed to meet the following day (September 5, 2024) for the controlled purchase of above firearm for $1,350.

40. While traveling to the parking lot of the Super 8 hotel, TALLEY called the CI who advised the CI that the firearm he (TALLEY) agreed to sell the CI was no longer available.  TALLEY advised the CI that he (TALLEY) would get another firearm to sell the CI.  The CI arrived in the parking lot of the Super 8 at approximately 4:11 p.m.  The CI parked next to a black colored 2013 BMW, 528i, bearing California license plate 9EPY801 (**Attachment A-1**).  This BMW is known to be ROBERTS's, but the DMV records show the registration is suspended.  ROBERTS was sitting in the driver's seat of the BMW with another ROBERTS associate.

41. The CI observed that THURSTON was in the parking lot and began to speak with him. THURSTON entered the front passenger seat of the CI's vehicle and gave the CI his (THURSTON's) new phone number. Roberts exited his vehicle and walked over to the CI's vehicle to speak with the CI through his/her open driver's side window. Learning that the CI had money and that TALLEY's deal with the CI had fallen through, ROBERTS advised that a friend of his (ROBERTS) had a friend that had two fully-automatic rifles for sale. ROBERTS advised the CI that one of the rifles was a fully-automatic SKS style rifle and the other was a fully-automatic MAC style machinegun. ROBERTS also advised the CI that his (ROBERTS) friend also had two revolvers for sale.

42. After ROBERTS and THURSTON argued over the prices the revolvers should be, the CI advised ROBERTS that he/she would like to purchase both revolvers. THURSTON interjected that the CI's money was now integrated into his (THURSTON's) "family" and referred to ROBERTS as his nephew. ROBERTS left the CI's vehicle to meet the seller of the revolvers who ROBERTS saw in the parking lot of the Super 8 hotel. ROBERTS met with the unidentified seller of the revolvers and came back to the CI's vehicle at approximately 5:05 p.m. ROBERTS advised the CI that the seller wanted $1,250 for both revolvers. ROBERTS informed the CI that the .38 caliber revolver cost $800 and the .22 caliber revolver cost $450.

43. The CI agreed to these prices and ROBERTS exited the CI's vehicle. ROBERTS got into his (ROBERTS) BMW, and the unidentified seller of the revolvers got into ROBERTS from passenger seat. At 5:08 p.m., ROBERTS exited his BMW and re-entered the CI's rear passenger seat. ROBERTS showed the CI both revolvers and advised the CI that he (ROBERTS) got the best ones. THURSTON unloaded both revolvers and held onto the ammunition. After unloading each revolver, THURSTON would pull the trigger of the revolver a number of times making sure that the firearms functioned. The CI had both revolvers, but THURSTON was continuing to hold onto the ammunition. The CI asked THURSTON if he (THURSTON) was going to give him/her the ammunition for the revolvers. THURSTON again argued with the CI over money. The CI gave ROBERTS the $1,250 for the revolvers. ROBERTS exited the CI's vehicle and entered his BMW, where ROBERTS paid the seller. The CI paid ROBERTS and THURSTON $100.00 each for facilitating the firearms deal. Upon receiving the $100 from the CI, THURSTON then handed the CI the ammunition he (THURSTON) had been holding.

17

44. One of the two revolvers purchased was an RG Industries, model RG40, .38 caliber revolver loaded with six (6) rounds of ammunition.

 

45. The second revolver was an RG industries, model RG23, .22 caliber revolver loaded with six (6) rounds of .22 caliber ammunition.

 

46. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with THURSTON and ROBERTS. It should be noted that the actual language used in the conversation between the CI, THURSTON and ROBERTS is summarized here and explained in a way that clarifies the language they used in speaking to one another. The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

**September 10, 2024 – the CI purchased Privately Manufactured Firearm Machinegun with 30 round high-capacity magazine from TALLEY and a Privately Manufactured Firearm Any Other Weapon (NFA carbine) with high-capacity magazine**

47. On September 7, 2024 at approximately 6:00 p.m., the CI took the following photograph of TALLEY's phone. the CI was advised by TALLEY that he (TALLEY) wanted $1,700 for the firearm which was purported to be fully automatic.



48. On September 10, 2024, the ATF conducted a controlled purchase of a PMF AR-pistol style machinegun from TALLEY using the CI. The CI also purchased a PMF Any Other Weapon (NFA carbine) from Tae SANDERSON in the parking lot of the Super 8 hotel. Prior to this date and at the direction of agents, the CI made numerous recorded communications with TALLEY and with SANDERSON respectively to line up the two firearm deals.

19

49. At approximately 4:17 p.m. on September 10, the CI arrived in the parking lot of the Super 8 hotel in his/her vehicle. Upon the CI's arrival, he/she immediately received a text message from TALLEY stating that TALLEY could see the CI. TALLEY had been waiting in the parking lot. After the CI parked, TALLEY entered the front passenger seat of the CI's vehicle. TALLEY handed the CI the agreed-upon PMF AR-pistol style machinegun but informed the CI that the magazine was different because the 100-round high-capacity magazine was broken. The CI exchanged $1,700 for the machinegun with TALLEY. This machinegun was loaded with thirty rounds of .223 caliber ammunition. Photos of this machinegun and ammunition are depicted below.

 

50. Having been dropped off to complete this transaction with the CI, TALLEY remained in the vehicle with the CI after this transaction. At 4:57 p.m., an associate of ROBERTS who the CI who previously introduced themself as "Tae," arrived at the Super 8 parking lot. Agents were able to identify "Tae" as Taezon Laurece SANDERSON with the assistance of the Vallejo Police Department. SANDERSON has a prior felony for carrying a loaded firearm in a public place. SANDERSON is also on active probation for a robbery case out of Alameda County, California.

51. SANDERSON entered the CI's rear passenger seat behind TALLEY and immediately produced the Any Other Weapon that SANDERSON had agreed to sell the CI through previous recorded communications. It should be noted that the firearm is classified as an Any Other Weapon under the National Firearms Act ("NFA"). [1] The Any Other Weapon

---

[1]    Firearms meeting the definition of "any other weapon" are weapons or devices capable of being concealed on the person from which a shot can be discharged through the energy of an explosive…certain alterations to a pistol or revolver, such as the addition of a second vertical handgrip, create a weapon that no longer meets the definition of pistol or revolver.

was loaded with 31 rounds of assorted 9mm ammunition. After receiving the weapon, the CI handed SANDERSON the agreed upon $950. SANDERSON was driving a dark-colored 2007, Infinity, M35 bearing California license plate 5VZP875 (**Attachment A-4**). DMV records show this vehicle registered to Charles and Hillary Moore at 702 Vinewood Avenue, Roseville California. Photographs of the Any Other Weapon and ammunition are depicted below.



52. After collecting the firearms from the CI, I field tested the PMF machinegun purchased from TALLEY. I recognized that this firearm tested as fully automatic. I opened the receiver of the PMF and located a drop-in swiftlink style machinegun conversion device within the receiver.



53. An ATF interstate nexus expert confirmed that the ammunition possessed and sold by SANDERSON on September 10, 2024, was not made in California and, therefore, necessarily moved interstate of foreign commerce when purchased in California.

21

54. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with TALLEY and SANDERSON.  It should be noted that the actual language used in the conversation between the CI, TALLEY and SANDERSON is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

### September 17, 2024 – the CI purchased a Machinegun from TALLEY

55. On September 12, 2024, at 7:39 p.m., TALLEY sent the CI two photographs of a machinegun he (TALLEY) had for sale using his (TALLEY's) mother's phone number.  TALLEY advised the CI that he (TALLEY) wanted $1,200 for the firearm.  The CI used the phone number he/she had for TALLEY at the time and also communicated to TALLEY through SANDERSON's cell phone number as well to discuss this deal. The photographs that TALLEY sent the CI are depicted below.

 

56. On September 12, the CI contacted SANDERSON via phone to see if SANDERSON had any contact with TALLEY, due to TALLEY's phone being off.  SANDERSON informed the CI that SANDERSON and TALLEY were together.  TALLEY got onto

SANDERSON's phone and spoke to the CI to discuss firearms and prices at the direction of agents.

57. On September 16, the CI exchanged a variety of text messages with TALLEY using the number the CI had for TALLEY at the time. The CI and TALLEY confirmed the details of the following day.  TALLEY agreed to sell the CI a machinegun for $1,350 on the following day.  Additionally, on September 16, the CI contacted THURSTON via phone. THURSTON agreed to sell a rifle to the CI for $1,800 and also agreed to meet at the Super 8 hotel.  For safety reasons, this controlled purchase with THURSTON did not go forward.

58. On September 17, the ATF conducted a controlled purchase of a PMF machinegun using the CI.  At the direction of agents, the CI placed multiple recorded communications with TALLEY and SANDERSON to purchase the firearm advertised by TALLEY in the photos reproduced below.  the CI and TALLEY agreed to meet on the 17th for the controlled purchase of above firearm for $1,350.

59. On September 17, at 4:22 p.m., the CI pulled into the Super 8 hotel in his/her vehicle.  At approximately 4:31 p.m., SANDERSON arrived driving his Infinity M35 (**Attachment A-4**) with TALLEY in his vehicle. TALLEY and SANDERSON entered the CI's vehicle. TALLEY sat in the front seat of the CI's vehicle and with SANDERSON sitting in the rear passenger seat behind TALLEY.  TALLEY removed the PMF machinegun from his waistband.  As the CI reached over to take the firearm from TALLEY, SANDERSON advised that the firearm was fully automatic.  The CI paid TALLEY $1,350 for the PMF machinegun.

60. The CI advised TALLEY that he/she was looking for a line on drop-in style machinegun conversion devices.  TALLEY advised that he had them.  TALLEY then discussed prices with the CI for the machinegun conversion devices.  Photographs of the machinegun the CI purchased from TALLEY are depicted below.  It should be noted that the firearm depicted below is the same firearm that TALLEY sent the photographs of to the CI utilizing his (TALLEY's) mother's phone number.



61. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with TALLEY and SANDERSON.  It should be noted that the actual language used in the conversation between the CI, TALLEY and SANDERSON is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

62. The machinegun conversion devices discussed and offered for sale by TALLEY, ROBERTS, SANDERSON, and others in this investigation are manufactured solely for the purpose of defeating the way the AR-variant receivers are designed to function, which is in a semi-automatic capacity.  The drop-in style machinegun conversion devices that ATF purchased in this investigation and that were installed in the AR-style firearms we purchased were all 3D printed.  These drop-in style machinegun conversion devices serve no utilitarian purpose other than the make an AR-style firearm fully automatic.  Once installed, the user of the firearm will be able to fire multiple rounds with one movement of the trigger.  After the drop-in machinegun conversion device is installed, the user is able to fire an entire magazine through the firearm by simply pressing and holding the trigger to the rear one time.

24

**September 30, 2024 – The CI purchased of an SCCY, CPX, 9mm pistol and a
Norinco SKS, 7.62x39 caliber rifle from ROBERTS**

63. On September 24, 2024, the CI received a text message on his/her recorded phone from
SANDERSON.  The message was about a firearm for sale.  SANDERSON sent the
picture depicted below to the CI.  SANDERSON advised the CI that SANDERSON
wanted $900 for the pistol.



64. On September 25, 2024, at approximately 2:03 p.m., SANDERSON sent the image
below to the CI on his/her recorded phone to show the CI what he (SANDERSON) had
for sale.



65. On September 29, 2024, at approximately 9:13 p.m., the CI used his/her recorded phone
and contacted ROBERTS on his (ROBERTS) phone to coordinate the next day's

25

purchase of firearms.  The CI talked to ROBERTS.  ROBERTS advised the CI that he (ROBERTS) had at least two or three firearms for sale.  ROBERTS and the CI agreed to complete the deal the next day at the Super 8 hotel.

66. On September 30, 2024, the ATF conducted a controlled purchase of an SCCY, CPX, 9mm pistol and a Norinco SKS, 7.62x39 caliber rifle from ROBERTS in the parking lot of the Super 8 hotel using the CI.

67. On September 30, 2024, at approximately 5:48 p.m., the CI arrived in the parking lot of the Super 8 hotel.  The CI exited his/her vehicle and observed ROBERTS backing into a parking spot in the Super 8 parking lot across from where the CI parked their vehicle. ROBERTS parked and exited the vehicle he was driving.  This vehicle was the 2011 Audi Q5 quattro bearing California license plate number 6PFW459.

68. ROBERTS made contact with the CI in the parking lot and advised the CI that he (ROBERTS) had to go into the Super 8.  The CI went back to his/her vehicle to wait for ROBERTS.  At 5:56 p.m., ROBERTS exited the hotel and walked across the parking lot and entered the CI's vehicle.  ROBERTS removed and racked a purple framed pistol with a silver slide.  The CI asked ROBERTS how much he (ROBERTS) wanted for the firearm.  ROBERTS advised he was offering the gun for $1,100.  The CI counted out $1,100 in cash and handed ROBERTS the money in exchange for the SCCY, CPX-1, 9mm pistol loaded with 7 rounds of 9mm ammunition depicted below.



69. ROBERTS advised the CI that he (ROBERTS) needed to go and get the second firearm. ROBERTS left the CI's vehicle and re-entered the Super 8 hotel.  At 6:01 p.m., surveillance observed ROBERTS walking back toward the CI's vehicle.  The CI observed the rifle in ROBERTS hands and exited his/her vehicle to open the trunk for

ROBERTS. ROBERTS met the CI at the trunk of their vehicle. The CI paid ROBERTS $2,200 for the Norinco, SKS, 7.62x39 caliber rifle loaded with 28 rounds of 7.62x39 caliber ammunition. The rifle and ammunition are depicted below.

 

70. Upon collecting these firearms and ammunition from the CI, I observed that the SCCY pistol the CI had purchased had an obliterated serial number. A photograph of the obliterated serail number is depicted below.



71. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with ROBERTS. It should be noted that the actual language used in the conversation between the CI and ROBERTS is summarized here and explained in a way that clarifies the language they used in speaking to one another. The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the

recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

### November  13, 2024 – CS-1 purchased a Polymer 80, PMF pistol loaded with .45 caliber ammunition from TALLEY with ROBERTS providing security

72. On November 13, ATF conducted a controlled purchase using the CI to purchase a Polymer 80, PMF .45 caliber pistol bearing no serial number from TALLEY for $1,300 with $100 being paid to ROBERTS for him being present as security.

73. Between September 30, 2024, and November 14, 2024, the CI engaged in recorded phone contacts with TALLEY, ROBERTS, and SANDERSON about firearm sales. Specifically, the CI made contact with TALLEY on November 8, 2024, and TALLEY advised he, "got a incognito."  In the context of firearms trafficking, the term "incognito" is a reference to a machinegun conversion device that is not visible from the outside but converts a semi-automatic weapon into a fully-automatic weapon. Approximately an hour before the transaction, the CI contacted TALLEY again.  TALLEY requested the price to go from $1,200 to $1,300.  Before the deal, the CI arranged the purchase with TALLEY through recorded communications. The CI also arranged for ROBERTS to present over recorded communications to protect against TALLEY robbing the CI during the planned deal.

74. On November 13, 2024, at approximately 4:25 p.m., the CI arrived in the parking lot of the Super 8 hotel in his/her vehicle. After arriving in the hotel parking lot, the CI contacted ROBERTS over the phone. The CI learned that ROBERTS was in a Ford sedan deeper in the parking lot of the Super 8.  The CI located and entered the Ford sedan, sitting behind ROBERTS in the rear passenger seat approximately 4:28 p.m. Approximately one minute later, the CI contacted TALLEY via SANDERSON's cell phone.  SANDERSON advised that he (TALLEY) would be at the Super 8 soon.

75. At approximately 4:33 p.m., ROBERTS exited the Ford, and the CI and ROBERTS discussed the future purchase of firearms. ROBERTS advised that he had a fully-automatic pistol for sale for $1,300. At 5:03 p.m., TALLEY and SANDERSON (driver) arrived in a black Prius with black tinted windows. Agents observed the license plate of the Prius to be 9NIS825 (**Attachment A-5**). DMV records who this vehicle is registered to Lyla Borge. Lyla Borge is the same person listed as the subscriber for the phone number used by SANDERSON (based on previous phone carrier subpoenas). In addition,

to confirm the license plate was correct, agents queried 9NIS825 in a License Plate Reader Law Enforcement platform, and a photograph revealed the same Prius spotted at the Super 8 during surveillance on November 13.

76. At approximately 5:04 p.m., the CI exited the Ford sedan, and approached the black Prius, which was parked on the north side of the north parking lot. SANDERSON exited the driver's seat and greeted the CI. TALLEY stayed seated in the front passenger's seat. The CI entered the Prius and sat in the driver's seat.  The CI exchanged $1,300 for the Polymer 80, PMF, .45 caliber pistol and fourteen rounds of ammunition.  The firearm and ammunition are depicted below.



77. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with TALLEY and ROBERTS.  It should be noted that the actual language used in the conversation between the CI, TALLEY and ROBERTS is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

**November 20, 2024 – CI purchase of Machinegun from ROBERTS for $2,750**

78. On November 20, 2024, ATF purchased an RIA, M1911, .45 caliber pistol, a Glock, 19, 9mm pistol and a drop-in style MCD from ROBERTS for $2,750 using the CI.

79. During the previous purchase of a firearm from TALLEY on November 13, 2024, TALLEY sold the CI what he (TALLEY) represented was a fully-automatic pistol. However, upon field testing the firearm, an ATF Special Agent determined the firearm to be a semi-automatic pistol with two screws on the slide back plate used to attach a belt clip, and not a machinegun as TALLEY had claimed.

80. Between November 15 and 20, 2024, the CI engaged in recorded phone contacts with TALLEY and ROBERTS about firearm sales over his/her recorded phone. Specifically, on November 14, the CI made contact with ROBERTS explaining that TALLEY did not sell the firearm that he (TALLEY) said he was selling to the CI. ROBERTS expressed that he (ROBERTS) did not like that (the false representation of product), as it was a representation of himself (ROBERTS). The CI made in-person contact with ROBERTS on November 14. During the interaction, ROBERTS expressed to the CI that he (ROBERTS) wanted to make things right and had two rifles for sale, one of which was fully automatic.

81. On November 15, the CI made contact with ROBERTS. During the interaction, ROBERTS expressed that he (ROBERTS) had a possible Glock 23 for sale, and would sell it for $1,350, but was hesitant to sell the Glock 23 because it was his (ROBERTS's) personal firearm. Then, on November 16, ROBERTS contacted the CI, expressing that he (ROBERTS) would sell the CI a fully-automatic rifle for $2,500, and that the "piece alone costs $1,000." In this context, the "piece" described by ROBERTS refers to a drop-in style machinegun conversion device for an AR type firearm – converting the weapon from a semi-automatic firearm to a fully-automatic machinegun. In addition, on November 16, ROBERTS sent the CI two pictures of an AR-type pistol. The CI replied that a photograph of the drop-in auto sear was needed after the last purchase with TALLEY was not the promised product. ROBERTS then sent a photograph of an FN Five Seven 5.7 caliber pistol bearing the serial number 386466213, with no context.

82. On November 19, the CI made contact with ROBERTS telephonically via his/her recorded phone. ROBERTS expressed that he (ROBERTS) didn't want to talk over the phone but that he (ROBERTS) had everything discussed previously. The CI made in-person contact with ROBERTS to visually see the "piece" for the AR-type pistol, as well

as get a confirmation on prices and firearms for purchase. During the interaction, ROBERTS advised that he (ROBERTS) could sell the AR-type pistol without the drop in auto sear for $2,000, and with the drop-in auto sear for $2,200. ROBERTS then advised he did not want to sell the Glock pistol. On November 19, while with ROBERTS, the CI took a picture of the drop-in auto sear, and sent it to ATF Special Agent Andres, who verified that it was, in fact, a machinegun conversion device.

83. On November 20, 2024, the CI traveled to at the Super 8 parking lot and arrived around 2:00 p.m., as agreed upon with ROBERTS. The CI contacted ROBERTS via phone at approximately 2:06 p.m. ROBERTS advised the CI that he (ROBERTS) would be right down. At approximately 2:08 p.m., agents observed ROBERTS and an unidentified associate of ROBERTS known as "PR" enter the CI's vehicle. ROBERTS advised the CI that TALLEY was in Oakland and had the two firearms that were supposed to be for sale in his (TALLEY's) room. ROBERTS had no access to TALLEY's room to get the firearms. PR advised that he had a gun for sale.

84. ROBERTS advised the CI that a 1911-style pistol was available for purchase. ROBERTS advised the CI to hold on and exited the CI's vehicle. At 2:19 p.m., ROBERTS re-entered the vehicle in the front passenger's seat with a 1911 pistol. Upon entering the vehicle, ROBERTS said, while holding the 1911 pistol, "you can make some money off of this. I really wanna keep this (the 1911 pistol) motherfucker." The CI then asked, "so you're gonna sell me that (the 1911) with the what's the name?" ROBERTS added, "with the switch, just so you can have a gun. Cause the switch can go in the AR. I should keep this over my shit, I should save my Glock and keep this. This (the 1911 pistol) is so hard to come by." The CI asked ROBERTS how much he (ROBERTS) would sell the 1911 pistol and the drop in MCD for. ROBERTS advised that he (ROBERTS) would sell the 1911 pistol for $1,300 and $350 for the drop in MCD. ROBERTS advised that the drop in MCD was "upstairs." The CI paid $1,300 to ROBERTS for the 1911 pistol, then ROBERTS exited the vehicle and agents observed ROBERTS enter the Super 8 motel to get the drop in MCD.

85. Approximately 2:27 p.m., agents observed ROBERTS exit the motel and re-enter the vehicle. As ROBERTS entered the vehicle, he was seemingly on the phone with TALLEY. ROBERTS advised that TALLEY was headed to Oakland to pick up the AR pistol. At 2:29 p.m., ROBERTS exited the vehicle to retrieve change for the CI so they could complete the transaction for the drop-in MCD. Before ROBERTS shut the door, the CI told ROBERTS that the CI would purchase the other firearm PR offered for

31

$1,300 and would give ROBERTS $100 for the transaction (PR was no longer in the CI's vehicle at this point).

86. At approximately 2:31 p.m., ROBERTS returned to the vehicle from inside the motel (observed by agents) with a Glock 19 pistol. ROBERTS said, "This nigga (PR) keep telling me to try to get 15." ROBERTS advised he (ROBERTS) was trying to get PR at least $1,400 for the firearm. The CI counted $1,350 to ROBERTS and gave $100 to ROBERTS.  The firearms, ammunition, and MCD are depicted below.

 



87. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with ROBERTS.  It should be noted that the actual language used in the conversation between the CI, and ROBERTS is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

**February 5, 2025 – CS-1 purchased a weapon made from a rifle (NFA) containing a
Machinegun Conversion Device from TALLEY**

88. On February 2, 2025, at approximately 12:00 p.m., TALLEY contacted the CI to give the
CI his (TALLEY's) new number.  The number that TALLEY contacted the CI with was
(707) 289-7455. TALLEY then sent the below photograph to the CI.



89. On February 3, 2025, TALLEY contacted the CI to tell him/her that TALLEY had two
rifles for sale with one being a machinegun.  TALLEY advised the CI that he (TALLEY)
expected to have a third firearm for sale soon.

90. On February 4, TALLEY contacted the CI to check on the time for their deal the
following day. The CI advised the deal time would be 1:00 p.m.  On February 5, at 9:04
a.m., the CI contacted TALLEY via recorded communications to discuss the firearms
deal scheduled for later that day.  the CI and TALLEY agreed on the price of $1,600 for a
machinegun.

91. While this was underway, the team positioned a surveillance agent outside 3000 Irwin
Street, Vallejo (**Attachment A-2)** where TALLEY was believed to live.  Before this deal,
the surveillance agent saw TALLEY exit the front door of 3000 Irwin Street, stand on the
porch, and re-enter the front door at approximately 12:08 p.m.  The surveillance agent
again observed TALLEY as he exited the front door of 3000 Irwin Street while calling
the CI.  Having no ride to the agreed-upon location, TALLEY gave the CI the address of
3006 Irwin Street and told the CI to park there.

33

92. On February 5, 2025, ATF conducted a controlled purchase of a weapon made from a rifle (NFA) machinegun from TALLEY using the CI.  At 1:15 p.m., the CI pulled up to where TALLEY was standing on Irwin Street and TALLEY entered the front seat of the CI's vehicle.  Upon entering the CI's vehicle, TALLEY removed the firearm from his waistband.  TALLEY explained and showed the CI how to eject the firearms magazine, then opened the receiver and removed the MCD to show the CI.  TALLEY then re-installed the MCD and explained to the CI that the drop in was what made the firearm a machinegun, not the selector.  The CI gave TALLEY the agreed upon $1,600 in exchange for the machinegun.

93. After this deal, TALLEY exited the CI's vehicle and was observed by surveillance entering 3000 Irwin Street through the front door.  After collecting the purchased items from the CI, I function tested the NFA firearm and observed that the firearm tested as a machinegun.  The weapon made from a rifle, MCD, and ammunition are depicted below.






94. Agents subsequently reviewed the audio recording of the meeting and confirmed the basics of the CI's descriptions of the meeting and interaction with TALLEY.  It should be noted that the actual language used in the conversation between the CI and TALLEY is summarized here and explained in a way that clarifies the language they used in speaking to one another.  The summary and later summaries below are based upon agents' understanding of the language and terms used by the CI and others in the recorded conversations and, at times, what the CI understood the conversation to mean as he/her understood it.

**February 5, 2025 – Surveillance of TALLEY and confirmation of TALLEY's residence**

95. As part of this firearms trafficking investigation into TALLEY and associates, a confidential informant (the CI) has had numerous contacts with TALLEY using phone numbers (707) 674-1638, (707) 474-1462 and (707) 289-7455.  TALLEY started with the 1638 phone number and at the time of the authoring of this affidavit, TALLEY is utilizing the 7455 number.

96. As part of this investigation, ATF Special Agent Chris Bailey reviewed a police report involving TALLEY where a female by the name of Jewell Marie Rounds identified herself to be TALLEY's mother.  California Department of Motor Vehicles lists Rounds' address as 3000 Irwin Street, Vallejo, California 94591.

97. As mentioned above, TALLEY contacted the CI using TALLEY's mother's phone (707-474-1462) on September 4, 2024, when TALLEY sent the CI the photograph of a Glock pistol that featured an extended magazine and what appeared to be a machinegun conversion device on the rear plate of the slide.  TALLEY also sent the CI two photographs of a Polymer 80, PMF pistol that featured a machinegun conversion device. The same firearm ATF purchased from TALLEY and SANDERSON on September 17, 2024.

98. On January 7, 2025, TALLEY used the 1462 number and contacted the CI.  On the recorded call, TALLEY advised the CI that it was TALLEY on the phone.  TALLEY goes on to discuss with the CI various firearms that he (TALLEY) had for sale.  The CI asked TALLEY if the number he (TALLEY) was calling from was TALLEY's number. TALLEY's response was "kind of."  On the same day, approximately 33 minutes later, the CI called TALLEY back on the 1462 number.  At that time a female answered the phone.  The CI asked for TALLEY and the female advised that TALLEY had just left.

The female then read off the CI's phone number and asked if that was the CI's number. the CI confirmed that it was.  The female responded "oh damn…you gotta call Tae's (SANDERSON) phone he said."

99. On January 31, 2025, at approximately 9:08 a.m., the CI called TALLEY utilizing the 1462 number.  A female answered the phone again.  the CI asked if TALLEY was there and advised the female to tell TALLEY that the CI wanted to talk to him (TALLEY). The female asked the CI to hold on.  The female then called out TALLEY's name and told him that the CI was on the phone.  TALLEY then got on the phone and began to talk firearm sales with the CI.  TALLEY stated to the CI, "My mom just came in my room; I'm laid out with a bitch saying that (the CI) was on the phone."  Both the CI and TALLEY laugh at that.

100. Prior to the ATF purchase on February 5, 2025 from TALLEY, utilizing the CI, ATF Special Agent Bloom was conducting pre-operation surveillance when Special Agent Bloom observed TALLEY exit the front door of 3000 Irwin Street, Vallejo at approximately 12:08 p.m.  Special Agent Bloom observed TALLEY stand on the front porch for a short time before turning around and re-entering 3000 Irwin Street through the front door.  A still photograph is provided below.



101. On the same day at approximately 12:43 p.m., Special Agent Bloom observed TALLEY exit the front door of 3000 Irwin Street for a second time, wearing a gray hooded sweatshirt.  TALLEY made a phone call to the CI to confirm that the CI had gotten TALLEY's text message for the location to meet.  The location that TALLEY sent the CI was 3006 Irwin Street, very close to TALLEY's residence at 3000 Irwin Street. TALLEY used the number (707) 289-7455 for these contacts with the CI.

102. When TALLEY got into the CI's vehicle minutes later, TALLEY was wearing the same clothing (gray hooded sweatshirt and black pants).  During the firearms deal with the CI, TALLEY explained to the CI that he (TALLEY) had another rifle inside and planned, in the next few days, to have more drop-in style MCD's.  Immediately following the successful transaction of the machinegun with the CI, Special Agent Bloom observed TALLEY walk back to the front porch of 3000 Irwin Street and re-enter the residence. Before TALLEY re-entered the residence, however, Special Agent Bloom observed TALLEY fan out the money he had just been given by the CI in exchange for the machinegun.

103. On February 5, at approximately 1:45 p.m., ATF Special Agent Andres, who follows TALLEY's Instagram page "luldj__", observed a post from TALLEY which depicted six $2 bills and sixteen $100 bills. The bills are fanned out, face down on what appears to be the same red flannel blanket that the rifles were depicted to be on in the pre-deal photograph of the two rifles TALLEY had for sale. The time stamp on the bottom of the post displayed the time of "1:27 PM". It should be noted that the CI paid TALLEY $1,600 in $100 bills. No $2 bills were exchanged between the CI and TALLEY. In addition, the deal concluded between TALLEY and the CI at approximately 1:21 p.m. A picture of the Instagram post is located below.



104. The residence at 3000 Irwin Street in Vallejo is a one-story, single-family residence on the corner of Irwin Street  and Maple Avenue.  The house is a light-yellow color with green trim and the number "3000" displayed on the left side of the home.





### February 5, 2025 – Surveillance of SANDERSON and confirmation of SANDERSON's residence

105. On February 5, 2025, ATF Special Agent Chris Bailey conducted surveillance of SANDERSON at 2701 64th Avenue #7, Oakland, California.[2]

106. As part of a firearms trafficking investigation into SANDERSON and associates, the CI has had numerous contacts with SANDERSON using phone number 707-307-9111. Subscriber information received from T-Mobile show Lyla Borge at 4436 Linda Vista Avenue, Napa, CA as the subscribed user. The same address was used by SANDERSON on his California driver license, Y6938284, issued March 26, 2024. A second phone number (707-655-1339), which public source database queries associate with Borge, is one of SANDERSON's top callers per phone tolls received from T-Mobile.

107. Throughout the investigation, agents have observed the following vehicles driven by SANDERSON to transport firearms for sale.

    i.   2007 Infiniti, M45 bearing CA license plate 5VZP875 (**Attachment A-4**)
    ii.  2004 Toyota Prius bearing California license plate 9NIS825 (**Attachment A-5**)

108. The Toyota is registered to Lyla Borge at 4436 Linda Vista Ave, Napa, California.

109. Special Agent Bailey conducted queries of license plate readers for the vehicles and discovered that, on November 14, 2024, the Toyota was captured in what appeared to be an underground garage with location information indicating 6226 Camden Street, Oakland, California. Special Agent Bailey and I traveled to the area and discovered that no such building with an underground garage is located near 6226 Camden Street. Upon driving around the area, Special Agent Bailey observed 2701 64th Avenue, a building which Special Agent Bailey had been inside. Special Agent Bailey recalled that the license plate reader photograph appeared to be taken inside the garage of 2701 64th Avenue. Further review of license plate reader information showed that on December 4, 2024, the same vehicle was captured a block away from the location appearing to be departing on Bancroft Avenue.

---

[2] Agents will present a search warrant application for this location in the Northern District of California. But, some of the facts detailed here support probable cause for SANDERSON's vehicles: the 2007 Infiniti, M45 bearing CA license plate 5VZP875 (**Attachment A-4**) and the 2004 Toyota Prius bearing California license plate 9NIS825 (**Attachment A-5**).

110. Recent public source database queries for Borge show 2701 64th Avenue #207, Oakland, California, as her likely current address. Additionally, SANDERSON provided 2701 64th Avenue #207 as his residence when booked into Santa Rita Jail by the Alameda County Sheriff's Office in 2004.

111. On or about February 1, 2025, agents began receiving court-authorized GPS location information for SANDERSON's phone. After appearing to stay overnight in Sacramento for several nights, Special Agent Bailey observed that he appeared to be spending the night in the area of 2701 64th Avenue.

112. On February 5, 2025, Special Agent Bailey traveled to 2701 64th Avenue to conduct surveillance. While en route to the location, Special Agent Bailey noted that SANDERSON's location information appeared to move from the area to another part of Oakland. Special Agent Bailey arrived at 2701 64th Avenue and established surveillance. At approximately 9:11 a.m., Special Agent Bailey observed SANDERSON return to 2701 64th Avenue driving the Toyota as the sole occupant. He pulled into and parked the vehicle in the underground parking lot for the apartment complex. Special Agent Bailey waited and noted that SANDERSON's location information matched the movement of the vehicle arriving back at the residence and the surveillance was terminated.

**February 6, 2025 – Confirmation of THURSTON's residence**

113. On February 6, 2025, the CI contacted Special Agent Centofranchi in regard to information they learned about the location of THURSTON.  Throughout this investigation, THURSTON was known to frequently stay in various hotels with the most common being the Super 8 hotel located on 2070 Solano Avenue.  From November 21, 2024, until February 3, 2025, the CI was out of the greater Vallejo area.  In that time, the Super 8 hotel appears to have gone under renovation causing all patrons to be moved out of the hotel.  Also in that time, THURSTON dropped the number the CI had been communicating with him on.

114. Agents requested that the CI to return  to the Vallejo area on February 4 to complete the machinegun deal with TALLEY on February 5.  At the direction of agents, the CI was asked to refresh contact with ROBERTS, TALLEY, SANDERSON, and THURSTON. Agents instructed the CI to learn THURSTON's new phone number from ROBERTS if possible.

115.  On February 6, 2025, the CI was able to contact ROBERTS in person during an unrecorded interaction.  The CI advised me that, according to ROBERTS, THURSTON was staying at the Seabreeze Apartment Homes located at 100 Larissa Lane in Vallejo (**Attachment A-3**).

116.  At approximately 5:56 p.m., the CI contacted me with a screen shot of his/her text message with ROBERTS that displayed the phone number 707-334-0670 for THURSTON.  Special Agent Centofranchi tried numerous commercial and law enforcement databases by using THURSTON's personal information and new phone number in an effort to find THURSTON's new residence without success.  Special Agent Centofranchi instructed the CI to learn THURSTON's apartment number.

117.  On February 8, 2025, at approximately 4:08 p.m., Special Agent Centofranchi made contact with the CI who advised that they drove around the complex on 100 Larissa Avenue and happened across THURSTON up in the front of the complex. The CI advised me that upon THURSTON seeing the CI, THURSTON advised the CI that he (THURSTON) had firearms for sale.  The CI did not set up any firearms sales with THURSTON.

118.  On February 10, 2025, at 11:06 a.m., the CI contacted THURSTON over THURSTON's new phone number.  THURSTON answered the phone and advised the CI that he (THURSTON) was busy but would call the CI back.  At 1:03 p.m., the CI contacted THURSTON and asked when THURSTON would be ready to meet.  THURSTON agreed to meet with the CI and asked the CI where he/she was.  the CI advised THURSTON that they were by the front.  THURSTON advised the CI that he (THURSTON) would come and direct the CI where to go.

119.  On February 10, 2025, at 1:04 p.m. and 1:11 p.m., the CI sent me two pins of his/her location with THURSTON.  I determined through Google maps and the pinned locations that THURSTON was in Building #2.  The CI confirmed that THURSTON was staying in building 2 in apartment 116 on the bottom floor.  The CI advised me that the CI briefly entered the apartment with THURSTON.  The CI informed me that THURSTON lives in apartment 116 with his (THURSTON's) cousin.

120.  Special Agent Bailey traveled to 100 Larissa Lane, Apartment 116, and confirmed that the apartment was where the CI described and in the location the CI explained to me.

43

Thurston's apartment is a multi-unit apartment complex that is brownish-tan colored with blue trim. THURSTON's door is blue in color with the numbers 116 to the left side of the door.





**February 11, 2025 – Confirmation that ROBERTS is without a residence**

121. Throughout this investigation, ROBERTS used one of two vehicles when the CI would see him (ROBERTS) during firearms deals with other people or when the CI would do firearms deals with ROBERTS.  Those vehicles are the following:

     i.     White, 2011, Audi, Q5 Quattro bearing California license plate 6PGW459; and

     ii.     Black, BMW, 528i, bearing California license plate 9EPY801 (**Attachment A-1**)

122. DMV records for the White Audi show the registered owner to be Markita D. Hazzard at 739 San Pablo Ave. Apt.5, Pinole, California.

123. DMV records for the Black BMW showed that, on October 30, 2024, the vehicle was "Pending record insurance status not checked." Current DMV records list the Black BMW's registration as suspended.

124. ROBERTS, when using the white Audi Q5, would have the black BMW parked out front of 147 Masonic Drive in Vallejo.  The 147 Masonic Drive address is associated to Sophia Maxine Buster, who is believed to be ROBERTS' child(ren)'s mother.  Buster was also previously observed accessing ROBERTS' black BMW in front of the same residence.

125. On or about February 1, 2025, agents began receiving GPS location information for ROBERTS's phone.  Based on that GPS location information, it appeared as through ROBERTS spent most nights at Hazzard's address located in Pinole.

45

126. On February 10, 2025, Special Agent Bailey noted that ROBERTS' GPS location showed him away from his (ROBERTS) common Pinole address and near 147 Masonic Drive. At approximately 8:40 a.m., surveillance drove past 147 Masonic Drive and observed ROBERTS sleeping in the driver's seat of his (ROBERTS) BMW. ROBERTS was the sole occupant of the vehicle.

127. On February 11, 2025, the CI had telephonic contact with ROBERTS. ROBERTS and the CI had a conversation about ROBERTS and Hazzard breaking up. ROBERTS had asked the CI to take ROBERTS to Hazzard's Pinole address so that ROBERTS could collect personal items. ROBERTS also mentioned to the CI that he (ROBERTS) could use the CI's vehicle to move items out of ROBERTS BMW. The CI advised ROBERTS that he/she was unavailable to assist with this task.

128. Based on the GPS data for ROBERTS, Special Agent Bailey's observation of ROBERTS sleeping in his BMW, and the conversation with the CI, I believe that ROBERTS no longer has a permanent address but is likely storing items, including contraband or instrumentalities of his crimes in black BMW.

### Training and Experience Regarding Illegal Firearms Trafficking

129. I know from my training, experience, and discussions with other experienced law enforcement officials that those who illegally possess, manufacture and/or traffic in firearms frequently possess the following evidence of their unlawful activity on their electronic devices:

    i. Information concerning where and from whom the person purchased firearms or firearm parts;

    ii. Information concerning where and to whom firearms or parts were sold or transferred;

    iii. Records and/or documents of mailings, shipping or delivery, whether by the United States Postal Service or other private delivery services;

    iv. Information concerning methods used to advertise the availability of their firearms or firearm parts for purchase:

v.   Photos of their firearms or firearm parts;

vi.   Written, recorded oral, or digital communications with associates involved in the purchase/sale of firearms or firearm parts; and

vii.   Written statements showing profits made from the sale of firearms or firearm parts.

130. I know that those who illegally possess firearms often us cellular telephones to communicate with one another, either by voice or text message.  The information stored in a mobile telephone used by illegal firearm possessors, traffickers, and/or manufacturers is evidence of the associations of the illegal firearm possessor, trafficker, and/or manufacturer, some of which are related to illegal possession and transfer. Cellular telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user.  The text message history of a cellular telephone can contain evidence of illegal firearm possession, trafficking and/or manufacturing because it shows the communications or planned communications of a firearm possessor, trafficker, and/or manufacturer and the telephone numbers of those with whom the illegal firearm possessor, trafficker, and/or manufacturer communicated or intended to communicate. In this investigation, the CI has frequently communicated with ROBERTS, SANDERSON, and ANDERSON over cell phones to arrange the firearm deals, including discussing prices, types of guns available for sale, and logistics of the deals (where and when).  In this way, the cellular phones have been key instrumentalities of the crimes and violations uncovered in this case.

131. Illegal firearms possessors, traffickers, and/or manufacturers sometimes leave voice messages for each other, and this is evidence both of their mutual association and possibly their joint criminal activity.  Cellular telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by an illegal firearm possessor, traffickers and/or manufacturers.  Cellular telephones can also contain photographic data files, which can be evidence of criminal activity when the user was an illegal firearm possessor, trafficker and/or manufacturer who took pictures of evidence of crime.  Cellular telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones. Consistent with this experience, in this case, investigators recovered evidence from social media where TALLEY posted an image of money from his sale of a firearm to the CI.

132. Based on my training and experience, I know that people who possess firearms often maintain photographs or videos of their firearms and ammunition on their cellular telephones, including photographs or videos of the possessor holding or firing the firearm. Consistent with this experience, in this investigation, multiple defendants have shown or sent images of firearms available for sale.

133. I know that convicted felons are unable to possess a firearm and therefore these individuals tend to maintain a continual chain of communication with lookouts and co-conspirators to obtain firearms by illegal means or criminal activity. I also know that these communications are primarily conducted by cellular telephones. I know that people who negotiate the sale of firearms will often use cell phones to contact co-conspirators to obtain additional quantities of firearms and/or narcotics. I also know that photos of firearms and currency are often stored on such devices. Cellular phones can also supply historical information about the dates, times, duration, number, destination, and location of telephone calls, messages, photographs, video, audio, and other information processed or stored by the cellular telephone.

134. It has been my experience that people engaged in criminal activities utilize cellular telephones to maintain contact, either by telephone calls and/or text messaging, with close associates and people they trust, to include associates in the criminal activities, and that they carry these cellular telephones with them during the course of their criminal activities. Moreover, it has been my experience that people engaged in such criminal activities utilize these cellular telephones to take photographs and videos of themselves, their criminal associates, and other items related to their criminal activities, in some cases from the proceeds from their criminal activities. Relating to the ever-evolving level of cellular telephone technology, particularly increased storage capacity, through my training and experience, I know that cellular telephones can regularly store contacts, call logs, text messages, multimedia files, voicemail messages, and location/GPS data months and in some cases years from the date of the phone's activation. In this investigation, the CI has frequently communicated with ROBERTS, SANDERSON, and ANDERSON over cell phones to arrange the firearm deals, including discussing prices, types of guns available for sale, and logistics of the deals (where and when). In this way, the cellular phones have been key instrumentalities of the crimes and violations uncovered in this case.

48

135. Those who illegally possess firearms often, intentionally or unintentionally, retain paperwork and evidence indicating the source of that firearm whether it be by purchase, theft, or other means.

## CONCLUSION AND REQUEST TO SEAL

136. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, or attempt to kill the CI, I request that this affidavit and the resulting arrest warrants, and search warrants, be sealed on the Court's docketing system, with the exception of copies used by law enforcement officers participating in the investigation.

137. Based on the information detailed above, I respectfully request that Criminal Complaints be issued against the defendants listed below and, based upon those Criminal Complaints, arrest warrants be issued for each of the defendants based upon their violations of federal law, as detailed below.

| Defendant | Charge |
|---|---|
| Zuryess Anthony ROBERTS | On or about November 20, 2024, ROBERTS knowingly and intentionally possessed and transferred a machinegun, in violation of 18 U.S.C. § 922(o). |
| Taezon Laurece SANDERSON | On or about September 10, 2024, SANDERSON knowingly and intentionally was a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g). |
| Divaya James TALLEY | On or about February 5, 2025, TALLEY knowingly and intentionally possessed and transferred a machinegun, in violation of 18 U.S.C. § 922(o). |
| Anderson Purnell THURSTON | On or about August 7, 2024, THURSTON knowingly and intentionally was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). |
| Napoleon Curtis WASHINGTON | On or about July 31, 2024, WASHINGTON knowingly and intentionally was a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). |

138.   This Affidavit is also respectfully requests search warrants to search the locations and persons further described below and in **Attachments A-1 through A-5**.  The contraband, objects, and information for which we will search are described in **Attachment B**.

I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

/s/ Joseph Centofranchi

Joseph Centofranchi
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives.

Sworn to me over the telephone and SIGNED by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this _____18_____ day of February 2025.

HONORABLE JEREMY D. PETERSON
UNITED STATES MAGISTRATE JUDGE

Approved as to form:

*/s/ Jason Hitt*
Jason Hitt
Assistant United States Attorney

## ATTACHMENT  A-1

One Black 2013 BMW 528i, bearing California license plate 9EPY801, Vehicle Identification Number WBAXG5C57DDY35569 with suspended registration.

## <u>ATTACHMENT A-2</u>

**3000 Irwin Street, Vallejo, California 94591**. The residence is a yellow single-family residence with green trim and a brown room.  The numbers "3000" are displayed to the far left of the on Irwin Street. The authority to search includes any and all outbuildings or structures on the property. An image of the property is included and incorporated here by reference.



The authority to search includes all attached rooms, attics, basements, porches, locked containers and safes, and other parts therein, as well as the surrounding grounds, driveway, garages, carports, storage rooms, storage lockers, yards, trash containers, and outbuildings.

53

## **ATTACHMENT A-3**

**100 Larissa Lane, Apartment 116, Vallejo, California 94590**. The apartment unit 116 is located within a multi-unit apartment building that is a brown color with blue trim. The door to apartment unit number 116 is on the first floor of the southwest corner of Building #2 within the overall complex. The door to the apartment is blue with the numbers "116" appearing to the left of the door. Two images below show the overall complex and the red circle image below shows the front door of apartment number 116. These images are incorporated here by reference.





**ATTACHMENT A-4**

One 2007 Infiniti M45, bearing California license plate 5VZP875, Vehicle Identification Number: JNKAY01E27M305217, registered to Charles and Hillary Moore at 702 Vinewood Avenue, Roseville, California 95678

## ATTACHMENT A-5

One 2004 Toyota Prius, bearing California license plate number 9NIS825, Vehicle Identification Number: JTDKB20U540076949, registered to Lyla Borge at 4436 Linda Vista Avenue, Napa, California 94558.

## **ATTACHMENT B**

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses") between July 31, 2024, and the present:

- Engaging in the business of importing, manufacturing, or dealing in firearms, in violation of 18 U.S.C. § 922(a)(1)(A), and conspiring to do so;

- Felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1);

- Possession and transfer of a machinegun, in violation of 18 U.S.C. § 922(o);

- Traveling from any state or foreign country into any other state to acquire, or attempt to acquire, a firearm in such other state in furtherance of such purpose, in violation of 18 U.S.C. § 924(n); and

- Knowingly purchasing, or conspiring to purchase, any firearm in or otherwise affecting interstate or foreign commerce for, on behalf of, or at the request or demand of any other person, in violation of 18 U.S.C. § 932(b).

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. All firearms, ammunition, and other items relating to the possession, maintenance and use of firearms, including ammunition magazines, speed loaders, ballistic vests, spare firearms parts, holsters, cleaning kits, and all other documentation that relates to the possession, sale or transfer of firearms, including but not limited to photographs, receipts for the purchase or repair of firearms, firearm containers, carrying cases, and firearm boxes.

2. All machineguns, Glock Conversion Devices/"Switches" (machineguns), and parts used to assemble Glock Conversion Devices/"Switches."

3. Currency derived from the sale of firearms and money wrappers, rubber bands, money containers, and money counting machines.

4. Financial instruments purchased with large amounts of currency derived from the sale of firearms, including travelers' checks, bonds, stock certificates, cashier's checks, certificates of deposit, and money orders.

5. Records, information, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the commission of the Target Offenses.

6. Any boxes, bags, briefcases, suitcases or containers used to carry or conceal the items described in Attachment B.

7. Records and information, items, and indicia tending to establish the identity of persons in control of the premises and/or things described in the warrants, including utility bills, rent receipts, canceled checks, bank and other financial statements and records, deposit receipts, passports, driver's licenses, social security cards, mail, automobile titles, and other identification documents, land and lease titles, escrow papers, photographs, video and audio records, and keys.

8. Records and information, photographs, video recordings, audio recordings, items and other indicia evidencing membership, affiliation, association or interaction with thee Target Offenses, including notes, letters, mailings, correspondence, pictures, and audio or video recordings (even lyrics and performances) referring to firearm or ammunition trafficking.

9. All records and information, information, and documents, evidencing the manufacture, sale, distribution, or possession of firearms, including but not limited to books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOUs, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, evidence of off-site storage (such as storage locker receipts and safety deposit box rental records and keys), documents reflecting domestic and international travel (such as airline tickets, itineraries, and passports), and receipts showing travel (such as airline receipts, car rental receipts, hotel receipts, and fuel receipts).

10. Records and information showing unexplained wealth or evidencing the proceeds derived from the Target Offenses, including records concerning currency, precious metals, and/or jewelry, documentation relating to the purchase of real estate or motor vehicles; records evidencing the establishment of shell corporations and/or business fronts; records, documents, or other evidence relating to the existence of wire transfers, cashier's checks, and money orders; and money counting machines.

11. Records and information relating to firearms or money ledgers, firearms distribution or customer lists, firearms supplier lists, correspondence, notation logs, receipts, journals, books, pay/owe sheets, records and other documents noting the price, quantity, date and/or times when firearms were purchased, possessed, transferred, distributed, sold or concealed.

12. Records and information relating to lists of customers and related identifying information; types, amounts, and prices of firearms trafficked as well as dates, places, and amounts of specific transactions; any information related to sources of firearms (including names, addresses, phone numbers, or any other identifying information); any information recording schedules or travel.  Bank account records, wire transfer records, bank statements, money drafts, checks, letter of credit, credit card bills, safety deposit keys and records, money wrappers, money containers, income tax returns, records of financial transfers which reflect the money generated from the sale of firearms.

13. The following records and information contained in mobile telephones and/or electronic storage media, to the extent that they constitute evidence, fruits, and instrumentalities of a violation of the Target Offenses from on or about August 23, 2023 to the present.

   a. Names and contact information of individuals who may be engaged in firearms trafficking contained in any Electronic Device;

   b. Logs of calls (which would include last numbers dialed, last calls received, time of calls and duration of calls) both to and from an Electronic Device;

   c. Text messages both sent to and received from an Electronic Device relating to or referencing firearm trafficking and/or referencing individuals engaged in firearms trafficking.

   d. Incoming and outgoing voice mail messages both to and from an Electronic Device relating to or referencing firearm trafficking or individuals engaged in firearms trafficking.

   e. Browser messages and/or internet communications (e.g., e-mail; text messages, information from social media applications) both to and from an Electronic Device relating to or referencing firearms trafficking or individuals engaged in firearms trafficking; and

   f. All documents in electronic format, including photographs and videos, relating to or referencing firearms trafficking and/or individuals engaged in firearms trafficking.

14. Photographs or videos stored and/or maintained in either hard-copy format or within digital cameras, cellular telephones/smartphones, video recorders, computers or other electronic recording devices, where such images/videos depict the subjects of the investigation with co-conspirators and/or depict other evidence connected to the Target Offenses.

15. Equipment used for the protection of the property used to store trafficked firearms and/or proceeds derived from their sale, such as security systems and any form of counter-surveillance, such as two-way radios, police scanners, video surveillance systems, anti-bugging devices, police radios, surveillance cameras, monitors and recording devices, other cameras, along with the corresponding purchase, service, and billing records/documents for such devices.